Rel: January 13, 2023

**Notice:** This opinion is subject to formal revision before publication in the advance sheets of **Southern Reporter**.  Readers are requested to notify the **Reporter of Decisions**, Alabama Appellate Courts, 300 Dexter Avenue, Montgomery, Alabama 36104-3741 ((334) 229-0650), of any typographical or other errors, in order that corrections may be made before the opinion is printed in **Southern Reporter**.

# SUPREME COURT OF ALABAMA

## OCTOBER TERM, 2022-2023

_____

## SC-2022-0511

_____

## Brighton Ventures 2 LLC

## v.

## State of Alabama

## Appeal from Jefferson Circuit Court
## (CV-19-902016)

_____

## SC-2022-0512

_____

**St. John Life Center**

**v.**

**State of Alabama**

**Appeal from Jefferson Circuit Court**
**(CV-19-902017)**

———————————————

**SC-2022-0514**

———————————————

**Brighton Ventures 2 LLC**

**v.**

**State of Alabama**

**Appeal from Jefferson Circuit Court**
**(CV-19-902024)**

———————————————

**SC-2022-0745**

———————————————

**Brighton Ventures 2 LLC**

**v.**

**State of Alabama**

SC-2022-0511; SC-2022-0512; SC-2022-0514; SC-2022-0745; SC-2022-0746; SC-2022-0747

**Appeal from Jefferson Circuit Court
(CV-19-902016)**

_____

**SC-2022-0746**

_____

**St. John Life Center**

**v.**

**State of Alabama**

**Appeal from Jefferson Circuit Court
(CV-19-902017)**

_____

**SC-2022-0747**

_____

**Brighton Ventures 2 LLC**

**v.**

**State of Alabama**

**Appeal from Jefferson Circuit Court
(CV-19-902024)**

SHAW, Justice.

In these consolidated appeals, Brighton Ventures 2 LLC ("Brighton

Ventures") and the St. John Life Center ("the Life Center") appeal from a judgment of the Jefferson Circuit Court forfeiting $446,897.19 that was found to have been used as bets or stakes as part of an illegal gambling operation.[1] We affirm.

Facts and Procedural History

The City of Brighton ("the City") has an ordinance permitting the establishment of charitable bingo operations within its city limits. Under that ordinance, a business may apply for and obtain a license to offer bingo games, provided that the games comply with the provisions of the ordinance and that the business itself has a named charity through which it operates.

In early 2019, an application for a charity-bingo business license was submitted to the City on behalf of Super Highway Bingo ("the

---

[1]These cases were brought as in rem actions in the circuit court. Brighton Ventures intervened in case nos. CV-19-902016 and CV-19-902024, claiming an interest in the $27,955 and the funds in a BB&T Bank account that the State sought to condemn in those actions. The Life Center intervened in case no. CV-19-902017, claiming an interest in the funds in a Regions Bank account that the State also sought to condemn in that action. We have restyled each of the appeals to list either Brighton Ventures or the Life Center as the appellant challenging the circuit court's forfeiture judgment.

casino"). On the application, the Life Center, a local charity, is listed as the named charity. In February 2019, the City issued the requested business license, and, in March 2019, the casino officially opened. According to the record, Brighton Ventures was responsible for the day-to-day operations of the casino and, in exchange for its management services, received 85% of the casino's profits. The Life Center, in return, received 15% of the casino's profits.

Around the time the casino opened, the Alabama Attorney General's Office began an investigation into "electronic bingo" activity occurring there. "Electronic bingo is illegal in Alabama." State v. Epic Tech, LLC, [Ms. 1200798, Sept. 30, 2022] ____ So. 3d ___, ____ (Ala. 2022). As part of the investigation, Darryl Jackson went undercover into the casino. Jackson later testified that the primary form of entertainment offered to the casino's patrons was "electronic bingo" machines. According to Jackson, to play the machines, a patron either inserted cash directly into the machine or purchased a ticket from a cashier that could then be used with the machine. The patron then pressed a button on the machine to bet a certain number of credits on a particular game. Once the bet was placed, the patron pressed a "play" button and the machine determined

whether the player won or lost the game.

If the patron won, his credits went up; if he lost, his credits went down. The patron could either play again or "cash out," at which point the remaining credits would be printed on a receipt. The patron could then redeem the credits for cash by presenting the receipt to a cashier; the cashier would enter the information into a computer and give the patron the credit balance in cash. According to Jackson, no other form of business was offered at the casino.

The revenue generated from the machines each day was kept in the casino's cashier area in locked boxes or in the casino's safe until it was transported -- usually by an armed Brinks, Inc., courier truck -- to a bank and then deposited into a specified account. According to the State, typically, the revenue from the casino was deposited into an account at BB&T Bank ("the main account") that was opened in the Life Center's name. That account, the State said, was the "main account" out of which all the money for the casino's expenses were transferred to other accounts. Specifically, the money was then transferred into either the Life Center's account at Regions Bank ("the Regions account") or into Brighton Ventures' account with BB&T Bank ("the BB&T account"). The

money deposited into the Regions account was used to pay the casino's taxes and payroll. The money that was deposited into the BB&T account was used primarily to pay the casino's expenses.

Following a month-long investigation, the State executed multiple search warrants at the casino during which it seized, among other things, over 200 "electronic bingo" machines and large sums of cash. The State also executed search warrants on the main account, the Regions account, the BB&T account, and a local Brinks facility. In addition to seizing from the main account an amount that is undisclosed in the record, the State also seized $27,955 in cash that was being held at the Brinks facility, $50,060.19 from the Regions account, and $368,882 from the BB&T account. The amount of money seized from those three sources totaled $446,897.19.

Relevant to these appeals, the State then initiated separate actions, petitioning the circuit court for an in rem civil forfeiture of the $446,897.19 pursuant to § 13A-12-30(c), Ala. Code 1975, on the basis that that money had been used as "bets" or "stakes" for illegal gambling at the casino. Although Brighton Ventures and the Life Center were not specifically named as defendants in the State's petitions, because they

7

had ownership interests in the seized funds, they intervened in the proceedings.

In their initial responses to the State's petitions, Brighton Ventures and the Life Center denied that the funds seized were "used as bets or stakes in gambling activity" as described in § 13A-12-30(c) and argued that the State had unlawfully seized the funds. They also asserted counterclaims in which they alleged, among other things, that forfeiture of the funds constitutes an "excessive fine" in violation of the Excessive Fines Clause of the Eighth Amendment to the United States Constitution.

After the State filed replies to Brighton Ventures' and the Life Center's counterclaims, in which it alleged various affirmative defenses, it amended each of its petitions to clarify that it had obtained records from the casino that indicated that the money it had seized was connected to the casino's illegal gambling activities.

The State then moved to consolidate the cases. That motion was granted.

The circuit court held a bench trial during which it heard testimony from several witnesses, including Carl Johnson, the pastor of St. John

Baptist Church in Dolomite and the executive director of the Life Center. Johnson testified that he first considered partnering with the casino when he heard that it "was a charity bingo [operation] that could help" his nonprofit organization raise money. Johnson explained that Brighton Ventures was the only entity responsible for running and managing the casino and that the Life Center's only purpose was to serve as the named charity for the casino's charity-bingo business license.

When asked about the money that the Life Center received from the casino, Johnson admitted that he had no control over what funds were deposited into the Regions account and that he had trusted Brighton Ventures to manage that account. He also confirmed that the sole reason the Life Center established the Regions account was so that money from the casino could be held and later used for the casino's taxes and payroll. Additionally, Johnson explained that, typically, once money was deposited into the Regions account, it was then transferred to the BB&T account to help pay for the casino's expenses.

The circuit court then heard testimony from the casino's administrative assistant, Tearie Leslie, who testified that she was responsible for handling all of the casino's expenses. According to Leslie,

9

because the revenue generated by the casino each day was first deposited into the main account before later being distributed to the BB&T account, she often had to contact Johnson to get him to write checks out of the Regions account. Although Leslie acknowledged that that system was problematic, she said that they were working to improve the system around the time the State executed its search warrants on the casino and the subject bank accounts.

Vicki Wilson, a special agent with the Alabama Attorney General's Office, also testified during the trial. Agent Wilson indicated that she was the leader of the law-enforcement team that had executed the search warrant at the casino. According to Agent Wilson, as a result of the execution of the search warrant, law-enforcement officials were able to collect over 200 gambling machines and $89,000 in cash from the casino. When asked if she had a chance to observe how the casino's machines worked, Agent Wilson said that she had observed one of her partners playing a game on a machine and had noted that, before he could play the game, he first had to place a "bet." Once that bet was placed, Agent Wilson said, the machine proceeded with determining whether her partner was the winner or loser of the game. From there, Agent Wilson

said her partner had the option of placing another bet or "cashing out." Agent Wilson stated that, based on all of those factors, she believed that the casino's "electronic bingo" machines were, in fact, illegal gambling machines that did not offer the legally permissible game of "bingo" as defined by this Court in Barber v. Cornerstone Community Outreach, Inc., 42 So. 3d 65 (Ala. 2009).

Finally, Jackson testified that he had a great deal of experience investigating gambling operations in Alabama and that, as part of his investigation for the State in this case, he had gone to the casino at least three or four times and had used the machines. Jackson described what he observed each time he played the machines and that the machines were the only forms of business offered at the casino.

In addition to hearing the above testimony, the circuit court reviewed a variety of exhibits, including Jackson's undercover video footage of gameplay at the casino. The circuit court also examined documents showing that money from the casino was transported and held by Brinks and records showing numerous deposits of money from the casino and transfers between the subject bank accounts. Following the bench trial, the circuit court entered an order in favor of the State in

11

which it stated the following:

> "After consideration of all the evidence presented at the trial of these consolidated cases on November 8, 2021, and after consideration of all of the arguments and authorities cited by the parties, the Court hereby finds that the State has met its burden. This Court is reasonably satisfied that [the] seized accounts and funds are connected with illegal gambling activity, namely the bets and stakes wagered by patrons of the gambling establishments, [and] have been conclusively shown to exist in the seized accounts at issue in these consolidated matters. As such, this Court finds that they are illegal bets and stakes susceptible to forfeiture to the State pursuant to State law. See Ala. Code § 13A-1[2]-30(c) (1975)."

The circuit court then ordered the seized funds to be "transferred to the General Fund in accordance with the provisions of" § 13A-12-30(c). It did not, however, render a decision as to Brighton Ventures' and the Life Center's counterclaims. Brighton Ventures and the Life Center each filed posttrial motions that were denied.

In appeal nos. SC-2022-0511 and SC-2022-0514, Brighton Ventures appealed the circuit court's order insofar as it directed the forfeiture of the money seized from the Brinks facility and the BB&T account; in appeal SC-2022-0512, the Life Center appealed the circuit court's order insofar as it directed the forfeiture of the money seized from the Regions

12

account.[2] Because the counterclaims remained unresolved, this Court remanded the cases in accordance with the policy stated in Foster v. Greer & Sons, Inc., 446 So. 2d 605 (Ala. 1984), overruled on other grounds by Ex parte Andrews, 520 So. 2d 507 (Ala. 1987).

Following a hearing on July 14, 2022, the circuit court entered an amended final judgment in which it denied the counterclaims. Brighton Ventures and the Life Center filed new notices of appeal, appeal nos. SC-2022-0745, SC-2022-0746, and SC-2022-0747. All six appeals were consolidated by this Court.

Standard of Review

The circuit court issued its judgment following a bench trial during which evidence was presented ore tenus. We, therefore, apply the following standard of review:

> "'"[W]hen a trial court hears ore tenus testimony, its findings on disputed facts are presumed correct and its judgment based on those findings will not be reversed unless the judgment is palpably erroneous or manifestly unjust." Philpot v. State, 843 So. 2d 122, 125 (Ala. 2002). "'The presumption of correctness, however, is rebuttable and

---

[2]The Life Center also filed a separate appeal, appeal no. SC-2022-0513, in which it challenged the seizure of the funds from the main account pursuant to another forfeiture petition. However, the Life Center later filed a motion to dismiss that appeal, which was granted.

13

> may be overcome where there is insufficient evidence presented to the trial court to sustain its judgment.'" Waltman v. Rowell, 913 So. 2d 1083, 1086 (Ala. 2005) (quoting Dennis v. Dobbs, 474 So. 2d 77, 79 (Ala. 1985)). "Additionally, the ore tenus rule does not extend to cloak with a presumption of correctness a trial judge's conclusions of law or the incorrect application of law to the facts." Id.'"

State v. $223,405.86, 203 So. 3d 816, 822 (Ala. 2016) (quoting Fadalla v. Fadalla, 929 So. 2d 429, 433 (Ala. 2005)).

## Discussion

### I.

In their brief on appeal, Brighton Ventures and the Life Center ("the claimants") admit that the circuit court's conclusion that the seized funds are connected with illegal gambling activity "is not palpably wrong." Therefore, there is no dispute on appeal that the gambling activity at the casino was illegal. However, the claimants contend that the funds seized were a form of "gambling proceeds" that are not specifically included in the categories of funds that may be forfeited pursuant to § 13A-12-30(c) and, therefore, should not have been forfeited to the State. The claimants further argue that, even if the seized funds somehow constituted "bets" and "stakes" under § 13A-12-30(c), rather than "gambling proceeds," the State failed to present any evidence in

14

support of that finding during trial.

The claimants did not assert in either their posttrial motions or their joint posttrial brief that the funds seized were "gambling proceeds" and not "bets" or "stakes" that are subject to forfeiture under § 13A-12-30(c). We also do not see the issue raised elsewhere. " '[I]t is a well-settled rule that an appellate court's review is limited to only those issues that were raised before the trial court. Issues raised for the first time on appeal cannot be considered.' " Neal v. Neal, 856 So. 2d 766, 778 (Ala. 2002) (quoting Beavers v. County of Walker, 645 So. 2d 1365, 1372 (Ala. 1994)). However, the claimants did argue below that the evidence was insufficient.

Section 13A-12-30 provides that the following are subject to forfeiture:

> "(a) Any gambling device or gambling record possessed or used in violation of this article [Title 13A, Chapter 12, 'Gambling Offenses'] is forfeited to the state, and shall by court order be destroyed or otherwise disposed of as the court directs.
>
> "(b) Any vehicle possessed or used in violation of this article may be forfeited to the state and disposed of by court order as authorized by law.
>
> "(c) Money used as bets or stakes in gambling activity in

15

> violation of this article is forfeited to the state and by court order shall be transmitted to the General Fund of the state."

(Emphasis added.)

Caselaw holds that funds used in illegal gambling activity similar to the "gambling" or "electronic bingo" activity involved in these cases constitute "bets" or "stakes" under § 13A-12-30(c). In Wade v. State, 986 So. 2d 1212 (Ala. Civ. App. 2007), law-enforcement officials executed a search warrant at a gaming facility known as the "Joker's Wild Arcade" and seized 74 video gaming machines, $18,362 in cash, and various $5 gift certificates. The State filed a petition, pursuant to § 13A-12-20 et seq., Ala. Code 1975, seeking to condemn the seized gaming machines and cash. During the proceedings, Jefferson County Sheriff's Deputy Jack Self testified that, on three separate occasions, he had gone to the facility and had observed that, after a patron inserted cash into one of the gaming machines and played the game, the machine would then increase or decrease the number of credits the patron had until either all of the patron's credits were gone or the patron "cash[ed] out." 986 So. 2d at 1216. If a patron chose to "cash out," the machine would print a ticket showing the number of credits earned by the patron. Id. Upon

16

presentment of the ticket, an attendant would then hand the patron cash based on the number of credits that she had earned. Id. The defendants did not offer any testimony or other evidence to refute the evidence that had been presented by the State. The trial court entered an order finding that the defendants' activities were part of an illegal gambling enterprise and ordering, pursuant to § 13A-12-30, that the 74 gaming machines be destroyed and that the cash seized be forfeited to the General Fund of the State. Id. at 1216-17.

On appeal, it was argued that the forfeiture of the gambling machines and money was unreasonable and not proper under Alabama law. Citing § 13A-12-30, the Court of Civil Appeals explained:

"In this case, it is undisputed that an employee of the Joker's Wild Arcade paid [patrons] in cash as a result of their having earned credits on multiple gaming machines on multiple dates. The payment in cash as a reward for playing the gaming machines, in and of itself, violated the antigambling laws of this State.

"Additionally, it was undisputed at the forfeiture hearing that operation of the gaming machines was the only business being conducted on the premises of the Joker's Wild Arcade. Therefore, any money found on the premises of the Joker's Wild Arcade must have been received as 'bets' from the players or used as 'stakes' in furtherance of the business of the Joker's Wild Arcade."

17

986 So. 2d at 1220. In the absence of evidence to the contrary, the Court of Civil Appeals concluded, the "only reasonable inference to be drawn from the evidence in the case was that all the gaming machines and all the cash seized from the Joker's Wild Arcade were part and parcel of the same illegal-gambling enterprise." Id. at 1221. The Court of Civil Appeals held that, because "the seized gaming machines and seized cash had been used in violating the antigambling laws," they were properly forfeited to the State under § 13A-12-30. Id.

In these cases, the State presented a variety of evidence to show that the funds seized were "[m]on[ey] used as bets or stakes in gambling activity." § 13A-12-30(c). For example, Agent Wilson and Jackson both clearly testified that the money generated by the casino was from "bets" or "stakes" that were placed by patrons when they played the games on the casino's machines and that this was the only form of business conducted by the casino. Additionally, Johnson and Leslie testified that the money earned by the casino each day was first deposited into the main account before eventually being transferred into either the Regions account or the BB&T account.

The State supported the testimony with copies of documents from

Brinks showing that it was responsible for collecting money from the casino at the end of each day. The State also presented copies of bank statements and deposit slips for each of the subject accounts showing large sums of money either being deposited into those accounts or being transferred among them. The claimants did not offer any testimony or evidence to refute the evidence presented by the State.

Based on the above evidence, like in <u>Wade</u>, any money seized from the bank accounts at issue in these cases was first received as "bets" from the players or used as "stakes" in furtherance of the casino's illegal gambling activities before later being deposited into the subject bank accounts or taken by a Brinks truck. Thus, under these circumstances, the circuit court's determination that the funds seized were part and parcel of an illegal gambling enterprise was not erroneous. Therefore, the circuit court correctly concluded that the money at issue was undisputedly used as "bets" or "stakes" in violation of Alabama's antigambling laws and was, therefore, subject to forfeiture to the State under § 13A-12-30(c).

## II.

Next, the claimants argue that the forfeiture of the seized funds

from Brinks and their respective bank accounts constitutes an excessive fine in violation of the Excessive Fines Clause of the Eighth Amendment to the United States Constitution. According to the claimants, gambling offenses are either Class A or Class C misdemeanors under Alabama law, see §§ 13A-12-21 through 13A-12-25 and § 13A-12-27, Ala. Code 1975, and thus carry a fine of no more than either $6,000 or $500, respectively, see § 13A-5-12(a)(1) and (3). Relying on United States v. Bajakajian, 524 U.S. 321 (1998), in which the Supreme Court of the United States explained that certain forms of civil forfeiture violate the Excessive Fines Clause if they are "'grossly disproportionate to the gravity of a defendant's offense,'" id. at 326 (citation omitted), the claimants argue that, because the maximum fine applicable in this case would be $6,000 and the amount seized by and forfeited to the State was $446,897.19, the forfeitures ordered by the circuit court were "obviously a gross violation of the Excessive Fines Clause." The State argues, however, that its seizure of the money at issue was a "nonpunitive," "traditional civil in rem forfeiture" that falls outside the scope of the Excessive Fines Clause of the Eighth Amendment. Accordingly, the State contends that the proportionality standard announced in Bajakajian is inapplicable here

and the forfeiture was appropriate in these cases.

The Eighth Amendment provides that "[e]xcessive bail shall not be required, nor excessive fines imposed, nor cruel and unusual punishments inflicted" and is applicable to the states through the Fourteenth Amendment. See Timbs v. Indiana, 586 U.S. 586, ____, 139 S. Ct. 682, 687 (2019). At issue here is the clause "nor excessive fines imposed," which, as the Supreme Court has explained, "'limits the government's power to extract payments, whether in cash or in kind, "as punishment for some offense."'" Timbs, 586 U.S. at ____, 139 S. Ct. at 687 (citations omitted).

In the context of in rem civil forfeitures like the one at issue in these cases, the relevant inquiry in determining the applicability of the Excessive Fines Clause is whether the forfeiture is punitive. See Bajakajian, 524 U.S. at 331 n.6 ("Because some recent federal forfeiture laws have blurred the traditional distinction between civil in rem and criminal in personam forfeiture, we have held that a modern statutory forfeiture is a 'fine' for Eighth Amendment purposes if it constitutes punishment even in part, regardless of whether the proceeding is styled [as being] in rem or in personam."). See also Timbs, 586 U.S. at ____, 139

21

S. Ct. at 690 ("[C]ivil in rem forfeitures are fines for purposes of the Eighth Amendment when they are at least partially punitive."). "Forfeitures … are thus 'fines' [for purposes of the Excessive Fines Clause] if they constitute punishment for an offense." Bajakajian, 524 U.S. at 328. If, however, a forfeiture is nonpunitive in nature, meaning that it has the "hallmarks of traditional civil in rem forfeitures," including proceeding "against the currency itself" rather than "obtain[ing] a criminal conviction of [the defendant] personally," it may be deemed to "occupy a place outside the domain of the Excessive Fines Clause" and, thus, not subject to the proportionality analysis in Bajakajian. Id. at 331-32.

Although the issue has not been addressed by the appellate courts of this State, at least one federal court has discussed whether the forfeiture of proceeds from illegal gambling activity under § 13A-12-30(c) constitutes a "fine" for the purposes of the Excessive Fines Clause. In Pettway v. Marshall, No. 5:19-CV-1073-KOB, July 16, 2020 (N.D. Ala. 2020) (not reported in Federal Supplement), the plaintiffs in a federal suit contended that an in rem forfeiture action pending in state court seeking to forfeit illegal gambling funds under § 13A-12-30(c) violated the

Excessive Fines Clause of the Eighth Amendment. The federal court discussed the issue as follows:

> "Plaintiffs' Count I fails because Plaintiffs incorrectly assume that the freeze of the BBVA account constituted a 'fine' under the Eighth Amendment. In the context of in rem civil forfeitures, the relevant inquiry in determining the applicability of the excessive fines clause is not the nomenclature of the mechanism by which a government seizes property -- e.g., civil, in rem forfeiture or criminal fine -- but whether the payment is punitive or remedial. See United States v. Bajakajian, 524 U.S. 321, 331 n.6 (1998) ('Because some recent federal forfeiture laws have blurred the traditional distinction between civil in rem and criminal in personam forfeiture, we have held that a modern statutory forfeiture is a "fine" for Eighth Amendment purposes if it constitutes punishment even in part, regardless of whether the proceeding is styled in rem or in personam.') See also Timbs v. Indiana, 139 S. Ct. 682, 690 (2019) ('civil in rem forfeitures are fines for purposes of the Eighth Amendment when they are at least partially punitive').

> "… [N]on-punitive forfeitures fall outside the bounds of the Eighth Amendment. United States v. One Hundred Thirty Thousand Fifty-Two Dollars in United States Currency, 909 F. Supp. 1506, 1513 (M.D. Ala. 1995); Bajakajian, 524 [U.S.] at 328 (determining that forfeitures are fines only 'if they constitute punishment for an offense'); Browning-Ferris Indus. v. Kelco Disposal, 492 U.S. 257, 265 (1989) (explaining that a 'fine' is 'a payment to a sovereign as punishment for some offense').

> "The instant case features neither a payment nor a punishment. In the underlying civil in rem forfeiture action in State court, the State of Alabama seeks forfeiture of the $15,500 in Plaintiffs' account pursuant to Ala. Code § 13A-12-

23

30, which states that '[m]oney used as bets or stakes in gambling activity in violation of this article is forfeited to the state and by court order shall be transmitted to the general fund of the state.' In the [State's <u>in rem</u> action], the State of Alabama seeks recovery of the <u>proceeds</u> of allegedly illegal gambling activity. Unlike the forfeiture of property used <u>in furtherance</u> of illegal activity -- which, if punitive, requires an Eighth Amendment proportionality analysis to evaluate whether the forfeiture is excessive -- the '[f]orfeiture of <u>proceeds</u> cannot be considered punishment, and thus, subject to the excessive fines clause, as it simply parts the owner from the fruits of the criminal activity.' <u>United States v. Nelson</u>, No. 3:10-cr-23-J-32, 2012 U.S. Dist. LEXIS 20982, at \*4 (M.D. Fla. Feb. 21, 2012) (emphasis added) (citing to <u>United States v. Tilley</u>, 18 F.3d 295 (5th Cir. 1994)) and <u>United States v. Alexander</u>, 32 F.3d 1231, 1236 (8th Cir. 1994)). <u>See</u> <u>also</u> <u>Austin v. United States</u>, 509 U.S. 602, 622 n.14 (1993) ('a fine that serves purely remedial purposes cannot be considered "excessive" in any event'); <u>United States v. Masino</u>, No. 3:16cr17, 2019 U.S. Dist. LEXIS 34862, at \*34 n.18, 2019 WL 1045179 (N.D. Fla. Mar. 5, 2019) (distinguishing, in the context of a governmental forfeiture action to recover profit gleaned from an illegal bingo operation, between the 'forfeiture of only proceeds ... [of] criminally derived property' versus 'money legitimately obtained'); <u>United States v. Levine</u>, 905 F. Supp. 1025, 1031 (M.D. Fla. 1995) (finding that civil forfeiture of illegal proceeds is remedial rather than punitive)."

Additionally, other courts have recognized that the forfeiture of proceeds from illegal activity is remedial, not punitive, and is, therefore, not subject to the Excessive Fines Clause. <u>United States v. Betancourt</u>, 422 F.3d 240, 250 (5th Cir. 2005) ("'[T]he forfeiture of drug proceeds does

not constitute punishment, and thus neither the Eighth Amendment prohibition against excessive fines nor double jeopardy analysis is applicable.'" (quoting United States v. Buchanan, 70 F.3d 818, 830 n.12 (5th Cir. 1995))); United States v. One Parcel of Real Prop. Described as Lot 41, Berryhill Farm Estates, 128 F.3d 1386, 1395 (10th Cir. 1997) (holding "as a matter of law that forfeiture of drug proceeds … can never be constitutionally excessive"); United States v. Salinas, 65 F.3d 551, 554 (6th Cir. 1995) (holding that "forfeiture of drug proceeds is not punishment, but is remedial in nature," because "one never acquires a property right to proceeds"); and United States v. Alexander, 32 F.3d 1231, 1236 (8th Cir. 1994) ("Forfeiture of proceeds cannot be considered punishment, and thus, subject to the excessive fines clause, as it simply parts the owner from the fruits of the criminal activity.").

As in Pettway, these cases feature neither a payment nor a punishment. As explained in Part I of the "Discussion" section of this opinion, the seized funds in the underlying civil in rem forfeiture actions in the circuit court constituted proceeds of illegal gambling activity -- i.e., "[m]oney used as bets or stakes in gambling activity" -- and, as in Pettway, the forfeiture of those proceeds cannot be considered

punishment because it "simply parts the owner from the fruits of the criminal activity."

The claimants cite no caselaw indicating that the deprivation of proceeds from illegal gambling activity is punitive and can therefore constitute a "fine" under the Eighth Amendment. See Rule 28(a), Ala. R. App. P. Instead, they rely on cases, such as Harris v. State, 821 So. 2d 177 (Ala. 2001), in which our appellate courts have addressed the excessiveness of the forfeiture of property that was used in furtherance of criminal activity and, therefore, determined the forfeiture to be punitive in nature. In none of those cases, including Harris, however, did our courts reject the punitive-versus-remedial distinction that must be resolved before a proportionality analysis under the Eighth Amendment can even apply.[3] Under these circumstances, the claimants have failed to demonstrate that they are entitled to relief, and, thus, the judgment of the circuit court is affirmed.

---

[3]In Harris, the Court addressed an argument as to whether the seizure of proceeds from drug sales amounted to an excessive fine, but it did not hold, contrary to the above-cited federal caselaw, that such an analysis was required. Instead, the Court held that the forfeiture in that case would clearly not be excessive.

SC-2022-0511; SC-2022-0512; SC-2022-0514; SC-2022-0745; SC-2022-0746; SC-2022-0747

SC-2022-0511 -- AFFIRMED.

SC-2022-0512 -- AFFIRMED.

SC-2022-0514 -- AFFIRMED.

SC-2022-0745 -- AFFIRMED.

SC-2022-0746 -- AFFIRMED.

SC-2022-0747 -- AFFIRMED.

Bolin, Wise, Bryan, Sellers, Mendheim, and Stewart, JJ., concur.

Mitchell, J., concurs in part and concurs in the result, with opinion, which Parker, C.J., joins.

MITCHELL, Justice (concurring in part and concurring in the result).

I agree with Part I of the main opinion -- the money seized was "used as bets or stakes" under § 13A-12-30(c), Ala. Code 1975. I also agree with the conclusion reached in Part II that the forfeiture was not a "fine" within the meaning of the Excessive Fines Clause of the Eighth Amendment to the United States Constitution. But, because § 13A-12-30(c) authorizes the forfeiture of money as an instrumentality -- not as proceeds -- of illegal gambling activity, I concur with Part II only to the extent that it reaches the correct result.

A property forfeiture is a "fine" subject to the Excessive Fines Clause when it is "at least partially punitive." Timbs v. Indiana, 586 U.S. ___, ___, 139 S. Ct. 682, 690 (2019) (citing Austin v. United States, 509 U.S. 602 (1993)). As the main opinion correctly notes, several federal courts have held that any forfeiture -- even a criminal in personam forfeiture -- of the proceeds (or fruits) of a crime is entirely nonpunitive.[4]

---

[4]Other courts have repudiated this view. See, e.g., United States v. Jalaram, Inc., 599 F.3d 347, 354 (4th Cir. 2010) (rejecting "the Government's argument that forfeiture of … the proceeds of a criminal conspiracy … is, by definition, nonpunitive"); United States v. Browne, 505 F.3d 1229, 1281-82 (11th Cir. 2007) (subjecting the forfeiture of proceeds under 18 U.S.C. § 1963(a)(3) to the Excessive Fines Clause);

28

See, e.g., United States v. Betancourt, 422 F.3d 240, 250 (5th Cir. 2005); United States v. One Parcel of Real Prop. Described as Lot 41, Berryhill Farm Estates, 128 F.3d 1386, 1395 (10th Cir. 1997); United States v. Salinas, 65 F.3d 551, 554 (6th Cir. 1995); United States v. Alexander, 32 F.3d 1231, 1236 (8th Cir. 1994). By contrast, the forfeiture of the instrumentality of a crime is entirely nonpunitive only if it is in the form of a traditional civil in rem proceeding -- that is, a proceeding "against the [property] itself" that serves a "remedial purpose," neither "designed to punish the offender" nor able to be "imposed upon innocent owners." United States v. Bajakajian, 524 U.S. 321, 331-32 (1998).

The money forfeited here under § 13A-12-30(c) was forfeited as an instrumentality of illegal gambling activity. The statute authorizes a proceeding against "[m]oney used as bets or stakes in gambling activity in violation of this article." § 13A-12-30(c) (emphasis added). In stark contrast to the proceeds-forfeiture cases cited by the main opinion, § 13A-

---

United States v. Corrado, 227 F.3d 543, 552, 558 (6th Cir. 2000) (explaining how "courts can reduce the forfeiture [of illegal proceeds under 18 U.S.C. § 1963(a)(3)] … so as not to violate the Eighth Amendment prohibition against … 'excessive fines'" and applying the Excessive Fines Clause to the forfeiture of proceeds).

29

12-30(c) makes no mention whatsoever of proceeds.[5] See, e.g., Betancourt, 422 F.3d at 250 (applying 21 U.S.C. § 853(a)(1), which prescribes the forfeiture of "any property constituting, or derived from, any proceeds the person obtained, directly or indirectly as the result of such violation"); One Parcel, 128 F.3d at 1395 (applying 21 U.S.C. § 881(a)(6), which authorizes the forfeiture of "all proceeds traceable" to an "exchange for a controlled substance or listed chemical"); Salinas, 65 F.3d at 552, 554 (same); Alexander, 32 F.3d at 1233 (applying 18 U.S.C. § 1963(a)(3), which provides for the forfeiture of "any property constituting, or derived from, any proceeds which the person obtained, directly or indirectly, from racketeering activity or unlawful debt collection"). Rather, by limiting forfeiture to "[m]oney used … in violation of this article," § 13A-12-30(c) prescribes the forfeiture of money only when it is "the actual means by which an offense was committed" -- that is, an

_____

[5]The Legislature has prohibited this Court from considering § 13A-12-30's title ("Forfeiture of gambling devices and gambling proceeds") as a matter of statutory construction. § 1-1-14(a), Ala. Code 1975 ("The classification and organization of the titles, chapters, articles, divisions, subdivisions and sections of this Code, and the headings thereto, are made for the purpose of convenient reference and orderly arrangement, and no implication, inference or presumption of a legislative construction shall be drawn therefrom.").

instrumentality. <u>Bajakajian</u>, 524 U.S. at 333 n.8. And, because the instrumentality forfeiture under § 13A-12-30(c) does not deviate from the hallmarks of a traditional civil <u>in rem</u> forfeiture -- it is against the money itself, based solely on its use in violation of the antigambling statutes, and is effective regardless of the guilt of the money's owner -- the forfeiture here was entirely nonpunitive and thus not subject to the Excessive Fines Clause.

Because the main opinion is correct that the forfeiture here was covered by § 13A-12-30(c) and not subject to the Excessive Fines Clause, I concur in part and concur in the result.

Parker, C.J., concurs.